# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
### No. 21-0647V

| | |
|---|---|
| MARIE FOSTER,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: February 6, 2024 |

*Leigh Finfer, Muller Brazil, LLP, Dresher, PA,* for Petitioner.

*Benjamin Patrick Warder, U.S. Department of Justice, Washington, DC,* for Respondent.

### **DECISION AWARDING DAMAGES**[1]

On January 12, 2021, Marie Foster filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered from a shoulder injury related to vaccine administration ("SIRVA") following an influenza vaccine she received on November 12, 2019. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons discussed below, and after hearing argument from the parties, I find that Petitioner is entitled to compensation in the amount of **$60,875.02**, representing $60,000.00 for actual pain and suffering, plus $875.02 for past unreimbursed expenses.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

I.   **Relevant Procedural History**

Approximately 18 months after this case was initiated, Respondent filed his Rule 4(c) report on July 18, 2022, conceding that Petitioner was entitled to compensation. ECF No. 23. A ruling on entitlement was issued on July 19, 2022. ECF No. 24. After a period of negotiation, the parties reached an impasse in their damages discussions in January 2023. ECF No. 32. The parties accordingly filed briefs setting forth their respective positions on the disputed pain and suffering. ECF Nos. 33 ("Br. on P&S"), 34 ("Resp. on P&S"). Later, each party filed a second brief addressing Petitioner's out-of-pocket expense and lost wages claims. ECF Nos. 38 ("Br. on Wages"), 39 ("Resp. on Wages"). I subsequently proposed that the parties be given the opportunity to argue their positions at a motions hearing, at which time I would decide the disputed damages issues. That hearing was held on January 29, 2024,[3] and the case is now ripe for a determination.

II.   **Relevant Facts**

*Petitioner's Medical History*

A complete recitation of the facts can be found in the Petition, the parties' respective pre-hearing briefs, and in Respondent's Rule 4(c) report.

Petitioner received a flu vaccine in her left arm on November 12, 2019. Ex. 1 at 2. At the time of her vaccination, she was a very active mother of four children, regularly playing and coaching volleyball, training horses (as a profession), fishing, hiking, hunting, playing basketball, and doing yoga. See Ex. 6 at 71.

On December 9, 2019 (27 days post-vaccination), Petitioner visited an orthopedic clinic with complaints of left shoulder pain that began after her flu shot and continually worsened. Ex. 5 at 12. She reported pain of 6/10. *Id*. On exam, Petitioner had tenderness to palpation, full strength, some guarding with ROM, and a positive impingement testing. *Id*. at 13. X-rays were normal. *Id*. She received a steroid injection and was referred to physical therapy. *Id*. at 12-13.

Petitioner returned to the orthopedic clinic on January 3, 2020. Ex. 5 at 9. She reported that her symptoms had not improved with the steroid injection and reported increased pain at 9/10. *Id*. On exam, Petitioner had limited range of motion in both

---

[3] At the end of the hearing held on January 29, 2024, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

abduction and forward flexion. *Id*. She was diagnosed with acute bursitis secondary to influenza vaccination, prescribed Meloxicam, and referred, again, to physical therapy. *Id*.

Petitioner began a course of physical therapy on February 24, 2020. Ex. 6 at 71-74. She reported that her flu shot had been painful and that the "pain didn't stop since that moment." *Id*. at 71. She described her pain as "constant but dull" at 2/10, and difficulty with reaching back to reach her pocket, tucking her shirt into her pants in the back, sleeping on her shoulder, and picking her baby up off the floor. *Id*. Petitioner had a total of 14 physical therapy sessions between February 24 and July 9, 2020. By her 8th session, she was "without complaints of pain." *Id.* at 34. Upon discharge, Petitioner had an 11% impaired function rating, had regained significant range of motion, had full strength, and had met all of her goals except for one. *Id*. at 5-6. For the goal of returning to full work duties as a horse trainer and volleyball coach – the physical therapist noted: "Pt returned to horse training but not coaching volleyball due more to 'fear of pain.'" *Id*. at 6. She was able to perform her duties as a horse trainer, pick up her infant son without pain, and perform ADLs. *Id*. The progress summary stated that Petitioner was unable "to do yoga or return to coaching volleyball due to the increased load with these activities." *Id*.

There are no additional medical records.

*Petitioner's Statements*

Petitioner filed an "impact statement" as Exhibit A to her memorandum in support of her pain and suffering request. ECF No. 33. She described her difficulty in caring for her infant son, and how she felt "robbed of the experiences she would have had with her last-born son." She described "sorrow, anger, regret, and helplessness." She also described lack of sleep and pain that made her cry from her initial physical therapy sessions. She said she had to miss a lot of work at what used to be her seasonal job coaching volleyball – which caused distress and caused her to regress in position (to assistant vs. supervisor). She notes that covid caused a "temporary pause on her road to recovery."

Petitioner also set forth her ongoing symptoms – including weakness and moderate pain on days she does "too much." She notes that she had not yet gone back to volleyball and claims she would have progressed to a full-time coach but for her injury. She claims the loss of this income caused her medical bills to go to collections and her credit to be ruined. She stated that she cannot play volleyball, even recreationally, without "complete fear of pain, numbness, and deep fear of shoulder surgery."

### III.     The Parties' Arguments

#### a. Petitioner

Ms. Foster seeks a total award in the total amount of $93,495.39, consisting of $80,000.00 as compensation for her pain and suffering, plus $875.02[4] for past unreimbursed medical expenses, and $12,620.37 in lost wages. Br. on Wages at 1.

Petitioner argues that her SIRVA injury was "moderate to severe," causing high levels of pain and requiring a cortisone injection and substantial physical therapy. Br. on P&S at 5. Further, she highlights the impact of her injury on her personal and professional life, including interfering with her ability to care of her youngest son, who was an infant at the time of her treatment, and destroying her ability to coach and play volleyball. *Id*. at 6.

Petitioner also argues that she lost coaching wages during the 2019-20 volleyball season due to her SIRVA injury, and seeks reimbursement for $12,620.37 in lost wages. Br. on Wages at 2-3. She claims she was "unable to keep up with the demands of [her] position" and only coached for one team due to her "debilitating shoulder pain." *Id*.

During the hearing and in her brief, Petitioner discussed prior SIRVA cases that involved injured claimants with similar fact patterns, and thus argued that an award of $80,000.00 in pain and suffering was reasonable and appropriate given that her circumstances were comparable. Br. on P&S at 4-6.

#### b. Respondent

Respondent argues that a pain and suffering award of $52,500.00 is appropriate, considering that Ms. Foster underwent an "entirely conservative" treatment course. Resp. on P&S at 6. He highlights that Petitioner received only one prescription medication, one cortisone injection, and treatment with physical therapy over an eight-month period. *Id*.

Respondent opposes an award of lost wages to Petitioner. Resp. on Wages at 7. He argues first that the Covid-19 Pandemic "likely would have" interrupted the volleyball season in 2020. *Id*. at 7. Further, Respondent further argues that Petitioner's medical records suggest that her decision not to return to coaching was based on her fear, rather than medical necessity. *Id.* at 8.

---

[4] Petitioner sought a higher amount in her brief, but the parties reached an agreement on the amount of out-of-pocket expenses to be awarded at the hearing on January 29, 2024.

During the hearing and in his brief, Respondent discussed prior SIRVA cases that involved injured claimants with similar fact patterns, and thus argued that an award of $52,500.00 in pain and suffering was reasonable and appropriate. Resp. on P&S at 9-11.

## IV. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[5] *Hodges v. Sec'y of*

---

[5] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

*Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## I.　　Prior SIRVA Compensation Within SPU[6]

### A.　　Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2024, 3,696 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 3,588 of these cases, with the remaining 108 cases dismissed.

2,075 of the compensated SPU SIRVA cases were the result of a reasoned ruling that petitioner was entitled to compensation (as opposed to an informal settlement or concession).[7] In only 200 of these cases, however, was the amount of damages *also*

---

[6] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[7] The remaining 1,513 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

determined by a special master in a reasoned decision.[8] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[9]

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[10] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *200* | *1,846* | *29* | *1,513* |
| **Lowest** | $40,757.91 | $10,000.00 | $45,000.00 | $2,500.00 |
| **1st Quartile** | $70,000.00 | $61,338.13 | $90,000.00 | $36,000.00 |
| **Median** | **$88,974.23** | **$81,049.85** | **$130,000.00** | **$53,500.00** |
| **3rd Quartile** | $125,007.45 | $110,000.00 | $162,500.00 | $80,000.00 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B. Pain and Suffering Awards in Reasoned Decisions

In the 200 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $210,000.00, with $85,000.00 as the median amount. Only nine of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[11]

---

[8] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (1,846 cases) or stipulation (29 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[9] Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[10] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[11] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In eight cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

## V.     Appropriate Compensation in this SIRVA Case

### a.  Awareness of Suffering

Awareness of suffering is not typically a disputed issue in cases involving SIRVA – and it does not appear to be herein either. Thus, based on the circumstances of this case, I find that Ms. Foster had full awareness of her suffering, and proceed to analyze the severity and duration of the injury.

### b.  Severity and Duration of Pain and Suffering

With respect to the severity and duration of the injury, Petitioner's medical records reveal a fairly mild SIRVA injury requiring limited treatment. Petitioner sought treatment for her pain 27 days after her vaccination, following up with her orthopedist only once with

continued complaints. Ex. 5 at 9, 12. She received a prescription for meloxicam, had one steroid injection, and completed 14 physical therapy treatments, after which she had met the vast majority of her treatment goals. *Id*.; Ex. 6 at 5-74. For the first two months of her injury, Petitioner reported significant pain, up to 9/10. Ex. 5 at 5, 12. In addition to her course of treatment, I consider the impact of an injury on one's employment and on the enjoyment of daily life activities in awarding an amount for pain and suffering. Ms. Foster described her difficulty in caring for her infant son, including being unable to pick him up off the floor. *See* Ex. 6 at 71. She also described the impact her injury had on her athletic activities, including yoga and volleyball, which she had previously enjoyed. *See id*. at 6; Ex. A.

After reviewing the record in this case and considering the parties' arguments during the hearing, I find that this is a fairly mild SIRVA injury – and thus Petitioner's demand for pain and suffering is a bit high. At best, she references *Dagen v. Sec'y of Health & Human Servs.*, No. 18-0442V, 2019 WL 7187335 (Fed. Cl. Spec. Mstr. Nov. 6, 2019), which is very factually similar to Ms. Foster's case. Br. on P&S at 5. That petitioner sought treatment within six weeks of vaccination, was prescribed prednisone, had one steroid injection, participated in nine physical therapy treatments, and was awarded $65,000 in pain and suffering. *Id*. at *2, 10. The degree of factual similarity between the course of the *Dagen* petitioner and Ms. Foster's course suggest an award of pain and suffering in the same range.

. Although Respondent cited several comparable prior SIRVA cases to support his proposed lower award, those cases generally involved petitioners who delayed initial treatment, which is a strong indicator of lower levels of pain and suffering, at least at the beginning of an injury. *See Rayborn v. Sec'y of Health & Human Servs.*, No. 18-0226V, 2020 WL 5522948 (Fed. Cl. Spec. Mstr. Aug. 14, 2020); *Ramos v. Sec'y of Health & Human Servs.*, No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021), *Couch v. Sec'y of Health & Human Servs.*, No. 20-1246V, 2022 WL 4453921 (Fed. Cl. Spec. Mstr. Aug. 24, 2022), and *Merwitz v. Sec'y of Health & Human Servs.*, No. 20-1141V, 2022 WL 17820768 (Fed. Cl. Spec. Mstr. Nov. 14, 2022). But there was no such delay in this case, rendering these comparables of lesser utility.

Overall, considering the arguments presented by both parties at the hearing, a review of the cited cases, and based on the record as a whole, I find that **$60,000.00** in compensation for past pain and suffering (slightly lower than the outcome in *Dagen*) is reasonable and appropriate in this case.

### c. Award for Past Unreimbursed Expenses

The parties have agreed that Petitioner is entitled to the sum of $875.02 in past unreimbursed expenses, and therefore Petitioner is awarded this sum without adjustment.

### d. Award for Lost Wages

Ms. Foster requests an award of $12,620.37 for lost wages during the 2019-20 volleyball season. Br. on Wages at 1. She relies primarily on the record of her final physical therapy treatment record, in which the physical therapist noted that she had an "inability to do yoga or return to coaching volleyball due to the increased load with these activities." *Id*. at 3; Ex. 6 at 6. She explained that prior to her injury she coached volleyball for "up to five (5) teams in one season," but that she served as only an "assistant coach for one (1) team for the 2019-2020 volleyball season," due to her injury. Br. on Wages at 3.

Respondent notes that the physical therapy record is "internally inconsistent," in that the language cited by Petitioner is contradicted by other notes stating that Petitioner "had made excellent progress with recovery of ROM" and that Petitioner had "no pain during objective testing of her left shoulder." Resp. on Wages at 8. He further highlights that the record also states that "Petitioner had stopped coaching volleyball due to fear of pain, not due to physical inability to perform her coaching duties." *Id*. Finally, Respondent argues that the Covid-19 Pandemic likely impacted the relevant season (as perhaps few to no games were played in this timeframe, when numerous group activities, like sports events, were curtailed). *Id*. at 7-8.

While Petitioner can point to a medical record that suggests she could not return to coaching volleyball, she has not provided preponderant evidence that her SIRVA injury *actually prevented her* from doing so – or was the predominant reason she did not receive wages for coaching in the relevant time period. Primarily, Petitioner has not shown that in fact she would have received coaching wages but for the SIRVA – that games were played, and that she could not coach regardless. She also has not provided any evidence from her employer, or any other person or entity, to bulwark her wage demands for the relevant time period. Accordingly, the lost wage claim is too speculative, and Petitioner's request for reimbursement for her lost wages is denied.

## CONCLUSION

In light of all of the above, the I award **Petitioner a lump sum payment of $60,875.02,** (representing $60,000.00 for Petitioner's actual pain and suffering, plus $875.02 for unreimbursable medical expenses) **in the form of a check payable to Petitioner, Marie Foster.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[12]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[12] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.